935 P.2d 105

SURVIVORS OF Amy IIDA, Deceased, Claimant–Appellant,

v.

ORIENTAL IMPORTS, INC., dba Ala Moana Gifts, Employer–Appellee,

and

Hawaiian Insurance Group, Insurance Carrier–Appellee,

and

Special Compensation Fund, Appellee.

SURVIVORS OF Amy IIDA, Deceased, Claimant–Appellee,

v.

ORIENTAL IMPORTS, INC., dba Ala Moana Gifts, Employer–Appellant,

and

Hawaiian Insurance Group, Insurance Carrier–Appellant,

and

Special Compensation Fund, Appellee.

Nos. 17948, 18253.

Intermediate Court of Appeals of Hawai'i.

March 11, 1997.

Herbert R. Takahashi, Stanford H. Masui, Danny J. Vasconcellos, and Rebecca L. Covert (Takahashi, Masui, Vasconcellos, of counsel), on the briefs, Honolulu, for claimant-appellant in No. 17948 and for claimant-appellee in No. 18253.

Wayne W.H. Wong (Suemori & Wong, of counsel), on the briefs, Honolulu, for employer/insurance carrier-appellee in No. 17948 and for employer/insurance carrier-appellant in No. 18253.

Frances E.H. Lum and Herbert B.K. Lau, Deputy Attorneys General, State of Hawai'i, Honolulu, for appellee Special Compensation Fund (no brief filed).

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

KIRIMITSU, Judge.

In this consolidated workers' compensation and attorney's fee and costs case, Claimant–Appellant Survivors of Amy Iida (Steven and Lynda) appeal from the January 13, 1994 order of the Labor and Industrial Relations Appeals Board (LIRAB) ordering repayment of dependant benefits;[1] and Employer–Appellant Oriental Imports, Inc. (doing business as Ala Moana Gifts) and Insurance Carrier–Appellant Hawaiian Insurance Group (collectively, Ala Moana Gifts) appeal from the May 4, 1994 order of the LIRAB awarding attorney's fees and costs to Steven and Lynda but denying attorney's fees to Ala Moana Gifts. We vacate the LIRAB's January 13, 1994 order and remand for action consistent with this opinion, but affirm the May 4, 1994 order.

## I. BACKGROUND

In 1989, Amy Iida (Amy) was employed by Ala Moana Gifts. On April 21, 1989, she suffered a dissecting aortic aneurysm.[2] A few weeks later, she succumbed to complications resulting from the aneurysm. Amy died on May 11, 1989. She was survived by

---

[1.] Although Claimant–Appellant Survivors of Amy Iida (Steven and Lynda) indicate that they are appealing the March 3, 1994 denial of their motion for reconsideration, their appellate brief does not address the merits of the motion before the Labor and Industrial Relations Appeals Board (LIRAB). Nevertheless, after reviewing the record, we agree with Employer–Appellee Oriental Imports, Inc. (doing business as Ala Moana Gifts) that the motion for reconsideration merely attempted to relitigate issues already ad-

judicated and decided by the LIRAB. In any event, in light of our conclusion vacating the LIRAB's January 13, 1994 order, we do not address the merits of the motion for reconsideration.

[2.] A dissecting aortic aneurysm is the "splitting or dissection of an arterial wall by blood entering through an intimal tear or hemorrhage...." *Stedman's Medical Dictionary* 72 (24th ed. 1982).

two children, Steven and Lynda Iida, who were both full-time college students at the time of her death.

On May 23, 1989, Steven and Lynda filed a claim for dependent benefits, which was opposed on behalf of Ala Moana Gifts by the Insurance Carrier–Appellee Hawaiian Insurance Group (HIG). Appellee–The Special Compensation Fund[3] later joined HIG in its opposition to Steven and Lynda's claim. Following procedural maneuvering by both sides, a hearing was held on Steven and Lynda's claim. At the conclusion of the hearing, the Director of Labor and Industrial Relations (the Director) found, among other things, that: (1) Amy's death was work-related; (2) Amy's employer was liable for Amy's medical, funeral, and burial expenses; (3) Ala Moana Gifts was to pay Steven and Lynda weekly compensation benefits of $358.00 from May 12, 1989 through June 24, 1990, for a total of $20,917.44, and, following Lynda's twenty-second birthday, pay Steven $214.80 per week from June 25, 1990 through November 28, 1991, for a total of $16,017.94; and (4) the request for Special Compensation Fund contribution was denied.

Ala Moana Gifts appealed the Director's decision. Ala Moana Gifts' initial primary contention before the LIRAB was that Amy's death was not work-related. It maintained this position on appeal until September 10, 1992, when it withdrew the issue of compensability. Following the concession of the compensability issue, the primary contention for Ala Moana Gifts became Steven's entitlement to dependent benefits. It argued that Steven had improperly received benefits because he had withdrawn from a number of classes or failed to enroll in the required number of classes to be considered a full-time student during a number of semesters. According to Ala Moana Gifts, Steven "was not entitled to benefits he received during the period from May 12, 1989 through November 28, 1991, as he failed to meet the definition of a dependent under [Hawai'i Revised Statutes (HRS) § 386–42(a)(2)] during the whole of that period."[4]

Ala Moana Gifts presented evidence that, after his mother's death, Steven had either failed or withdrawn from a number of classes. In the years following Amy's death, Steven attended the University of Hawai'i at Mānoa (UH), Hawaii Pacific University (HPU), and Kapiolani Community College (KCC). His transcripts revealed the following information about his scholastic career:

| Semester | Institution | Enrolled | Withdrawn | Failed | Received |
|----------|-------------|----------|-----------|--------|----------|
| Spring 89 | UH | 13 | 0 | 0 | 13 |
| Summer 89 | UH | 3 | 0 | 0 | 3 |
| Fall 89 | UH | 12 | 9 | 3 | 0 |
| Spring 90 | UH | 13 | 0 | 13 | 0 |
| Summer 90 | HPU | 6 | 0 | 0 | 6 |
| Fall 90 | HPU | 12 | 6 | 0 | 6 |
| Spring 91 | KCC | 6 | 3 | 3 | 0 |

In its January 13, 1994 findings of fact, conclusions of law, and decision and order, the LIRAB disagreed with the argument that Steven was not entitled to any of the compensation that he had received. It did, however, determine that Steven was a part-time student for the Fall 1989, Fall 1990, and Spring 1991 semesters because he withdrew

3. The Special Compensation Fund compensates an employee when the statutorily prescribed preexisting conditions and time requirements are satisfied. Hawai'i Revised Statutes (HRS) § 386–33 (1993).

4. The statute requiring full-time student status is HRS § 386–42(a), which is part of the workers' compensation law. The relevant portion of the statute provides: "The following persons, and no others, shall be deemed dependents and entitled to income, and indemnity benefits under this chapter: A child who is ... unmarried and under twenty-two if the child is a full-time undergraduate student at a college...." HRS § 386–42(a) (1993). HRS § 386–43(a) allows the weekly benefits to continue so long as the child remains a dependent as defined in section 386–42(a).

In addition, the Disability Compensation Division defines a fulltime student as "an individual who is considered a regular full-time student by the educational institution at which the individual is enrolled or registered." Hawai'i Administrative Rules (HAR) § 12–10–1.

from a number of classes and fell below the required twelve credit-hour requirement for full-time status or never enrolled in twelve credits at any point during the semester. In this same decision and order, the LIRAB also decided that Steven's part-time status in the Spring of 1991 rendered him ineligible for benefits during the Summer of 1991.[5] The LIRAB's decision and order required Steven to repay $10,847.40 for the Fall 1990, Spring 1991, and Summer 1991 semesters ($214.80 × 50.5 weeks). Additionally, the LIRAB concluded that Lynda's benefits were improperly calculated during the Fall 1989 semester when Steven was a part-time student.[6] According to the LIRAB, Lynda's benefits should have been reduced to $214.80 per week (($358 ÷ .6667) × 40%). Consequently, the LIRAB ordered a reimbursement of $2,291.20 for the Fall 1989 semester (($358.00—$214.80) × 16 weeks).

Steven and Lynda's subsequent motion for reconsideration was denied on March 3, 1994, and both then filed a timely notice of appeal.

Following the LIRAB's January 13, 1994 decision and order, Steven and Lynda filed a request for attorney's fees and costs on January 24, 1994. Ala Moana Gifts filed its own request for attorney's fees on February 11, 1994. On May 4, 1994, the LIRAB issued an order approving Steven and Lynda's request for attorney's fees and costs but denying Ala Moana Gifts' request for attorney's fees. On June 1, 1994, Ala Moana Gifts filed a timely notice of appeal from the attorney's fees and costs order.

On February 26, 1997, we issued an order consolidating Steven and Lynda's appeal from the reimbursement order with the employer's appeal from the attorney's fees and

costs order. As a result, the issues raised in both orders are addressed in this opinion.

## II. *DISCUSSION OF THE DEPENDENT BENEFITS ORDER*

The dispositive issue that we decide in this portion of the appeal is the appropriate definition of the phrase "full-time undergraduate student" used in HRS §§ 386–42(a) and 386–43(a) (1993). Before we establish the appropriate definition of the phrase and the proper method for determining how benefits are paid to full-time students using principles of statutory construction, we first discuss the standard of review and touch on the purpose of the workers' compensation statute. We then address the merits of the LIRAB's findings of fact and conclusions of law.

### A. *Standard Of Review.*

The standards of review for decisions by the LIRAB are described in HRS § 91–14(g), which provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or

---

5. Steven did not enroll in any classes during the Summer 1991 semester. In addition, he turned 22 on November 29, 1991 and was no longer eligible for dependent benefits from that date onward.

6. Under the workers' compensation statute, dependents are entitled to varying percentages of compensation depending on the existence of a widow or widower, if any, and the number of dependent children. HRS § 386–41 requires dependent benefits to be calculated in the following manner:

   [T]he employer shall pay weekly benefits to the deceased's dependents at the percentages of

the deceased's average weekly wages specified below, taking into account not more than the maximum weekly benefit rate prescribed in section 386–31 divided by .6667 and not less than the minimum prescribed in the section divided by .6667.

. . . .

   If there is no dependent widow or widower, but a dependent child, then to the child forty per cent, and if there is more than one dependent child, then to the children in equal parts sixty-six and two-thirds per cent.

HRS § 386–41(b) (1993).

(5) *Clearly erroneous in view of the reliable probative, and substantial evidence on the whole record;* or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993) (emphasis added). Accordingly,

> appeals taken from findings [of fact] set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires this court to sustain the Board's findings unless the court is left with a firm and definite conviction that a mistake has been made.
>
> A conclusion of law ... is not binding on an appellate court and is freely reviewable for its correctness. Thus, this court reviews [conclusions of law] *de novo*, under the right/wrong standard.

*Atchley v. Bank of Hawai'i,* 80 Hawai'i 239, 242, 909 P.2d 567, 570 (1996) (quoting *Bumanglag v. Oahu Sugar Co., Ltd.,* 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995)) (citations omitted).

In the same vein, our "interpretation of a statute is a question of law reviewable *de novo.*" *Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citing *Franks v. City & County of Honolulu,* 74 Haw. 328, 334, 843 P.2d 668, 671 (1993)).

There are several guidelines that assist our *de novo* construction of a statute. First, " '[t]he fundamental starting point for statutory interpretation is the language of the statute itself. . . . And where the statute is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.' " *Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 63, 868 P.2d 1193, 1210 (1994) (quoting *AIG Hawaii Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 633–34, 851 P.2d 321, 328 (1993)); *see Iddings v. Mee–Lee,* 82 Hawai'i 1, 19, 919 P.2d 263, 281 (1996) ("Our duty in interpreting statutes is to give effect to the legislature's intent[,] which is obtained primarily from the language of the statute.") (internal quotation marks and citations omitted). .

Second, despite the emphasis we place on statutory language, our supreme court has eschewed a taut application of the plain meaning rule. Indeed, the court has explained that our embracement of the plain meaning rule " 'does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review.' " *Sato,* 79 Hawai'i at 17–18, 897 P.2d at 944 (quoting *Richardson,* 76 Hawai'i at 68–69, 868 P.2d at 1215–16) (Klein, J., dissenting) (internal quotation marks and citations omitted).

Third, although we have adopted an altered form of the plain meaning rule, our need for extrinsic aids generally occurs when we are confronted with either ambiguity or absurd or unjust results from a strict interpretation of statutory language. As explained by the supreme court:

> where the language of a statute is ambiguous or of doubtful meaning, or where literal construction of the statute would produce an absurd or unjust result, clearly inconsistent with the purposes and policies the statute was designed to promote, judicial construction and interpretation are warranted and also the court may resort to extrinsic aids to construction.

*In re Hawaiian Tel. Co.,* 61 Haw. 572, 578, 608 P.2d 383, 387 (1980) (citing *State v. Ogata,* 58 Haw. 514, 518, 572 P.2d 1222 (1977); *County of Kauai v. McGonagle,* 33 Haw. 915, 920 (1936)).

Fourth, when, as in this case, an administrative agency is involved, we defer to the agency's interpretations of its rules unless deference would result in an absurd or unjust result, or be "plainly erroneous or inconsistent with the underlying legislative purpose." *International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citing *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984); 2 K. Davis, *Administrative Law Treatise* § 7.22, at 105–06 (2d. ed. 1979)).

### B. *Remedial Nature Of Workers' Compensation Statute.*

Our reporters are replete with cases holding that Hawai'i's workers' compensation statute is remedial in nature.[7] *See, e.g., Locations, Inc. v. Hawai'i Dept. of Labor & Indus. Relations*, 79 Hawai'i 208, 210, 900 P.2d 784, 786 (1995); *Treloar v. Swinerton & Walberg Co.*, 65 Haw. 415, 425, 653 P.2d 420, 427 (1982); *Evanson v. University of Hawaii*, 52 Haw. 595, 483 P.2d 187 (1971). An equal number of cases have recognized that our workers' compensation statute has a beneficent purpose and should be afforded "liberal construction in favor of the employee, to fulfill the humanitarian purposes for which it was enacted." *Respicio v. Waialua Sugar Co.*, 67 Haw. 16, 18, 675 P.2d 770, 772 (1984). Indeed, since the supreme court's first look at Hawai'i's then new workers' compensation statute in 1916, analyses in these kinds of cases have been grounded on the humanitarian purposes premise. *See, e.g., Lawhead v. United Air Lines*, 59 Haw. 551, 559–60, 584 P.2d 119, 124–25 (1978); *DeFries v. Association of Owners*, 57 Haw. 296, 303–04, 555 P.2d 855, 860 (1976); *Ichijiro Ikoma v. Oahu Sugar Co.*, 23 Haw. 291, 295–96 (1916).

Nevertheless, we acknowledge that the rule of liberal construction in workers' compensation cases has boundaries. In a caveat on this point, the supreme court explained that " '[t]he rule of liberal construction cannot be strained to the point of extending it to employments [or employment benefits] not within its scope or intent.' " *Locations, Inc.*, 79 Hawai'i at 211, 900 P.2d at 787 (quoting *Florida Indus. Comm'n v. Schoenberg*, 117 So.2d 538, 541 (Fla.Dist.Ct.App.1960)).

With the foregoing principles in hand, we now shift our focus to the construction of HRS §§ 386–42 and 386–43.

### C. *Definition Of The Word "Dependent" And The Phrase "Full-time Undergraduate Student."*

When a worker dies from a work-related injury or accident, HRS § 386–41 provides that "the employer shall pay weekly benefits to the deceased's dependents...." HRS § 386–41(b) (1993). The word "dependents" is defined in HRS § 386–42 for our purposes as a "child who is ... unmarried and under twenty-two years if the child is a full-time undergraduate student at a college...." HRS § 386–42(a) (1993). The next section of the statute, which establishes the duration of benefits, repeats the language of the preceding section by explaining that "[t]he weekly benefits to dependents shall continue ... [t]o or for a child ... so long as [the child is] unmarried and under twenty-two years if the child is a full-time undergraduate student at a college...." HRS § 386–43(a).

We believe a plain reading of the statute reveals the legislature's clear intent to provide the dependents of qualified employees an opportunity to obtain an undergraduate college education. The legislature obviously recognized the importance of higher level education; and in accordance with the humanitarian nature of the workers' compensation statute, attempted to provide dependents with a safety net following the death of a provider. The language of the statute also reveals, however, that the legislature did not intend for benefits to flow *carte blanche*. For instance, neither married children nor those twenty-two or older can receive weekly compensation under any circumstances. *Id.* at 386–42(a).

Additionally, to receive benefits, a dependent child over the age of twenty but under twenty-two must be a full-time undergraduate student at a college. *Id.* Although the phrase "full-time undergraduate student" is not defined in the statute, the Disability Compensation Division of the Department of Labor and Industrial Relations defines "full-time student" as "an individual who is considered a regular full-time student by the educational institution at which the individual is enrolled or registered." Hawai'i Administrative Rules (HAR) § 12–10–1. In our assessment, the Disability Compensation Division's description of "full-time student" is a reason-

---

**7.** " 'Generally, remedial statutes are those [that] provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries.' " *Flores v. United Air Lines, Inc.*, 70 Haw. 1, 12 n. 8, 757 P.2d 641, 647 n. 8 (1988) (quoting N. Singer, 3 *Sutherland, Statutes and Statutory Construction* § 60.02 (4th ed. 1986) (footnote omitted)).

able and practical definition that is consistent with the underlying legislative purpose of the statute. Hence, we defer to the definition found in HAR § 12–10–1.

In our case, neither side contests that the educational institutions at which Steven was enrolled or registered considered full-time status to be twelve credit-hours or more per week. Steven was thus entitled to weekly compensation as long as he was unmarried, under twenty-two, and a student carrying at least twelve credit-hours at a college.

### D. Steven And Lynda's Status And Entitlement To Benefits.

■ The crux of Steven and Lynda's argument is that Steven was a full-time student at the time of his enrollment during the semesters in question or made a good faith effort to enroll as a full-time student, and thus, under a broad and liberal application of the statute, he was in the class of persons intended to be covered. We disagree.

They primarily rely on the Second Circuit Court of Appeals' decision in *Haberman v. Finch,* 418 F.2d 664 (2d Cir.1969). In that case, Ellen Haberman (Ellen) appealed the denial of her benefits, which was based on her failing to qualify as a full-time student under the Social Security Act. Following her father's death, Ellen had to retain her full-time student status to receive benefits. The Act defined full-time students as those attending high school for no less than twenty hours per week. At age fourteen, Ellen became ill and was forced to abandon her studies. She was unable to resume her studies until age seventeen. Because of her age, however, she was not allowed to enter a traditional high school. Her only option was an evening program at an accredited private school. But the maximum number of hours available at the school was sixteen-and-one-half, below the number required by statute. When Ellen sued the agency for denying her

benefits, the district court granted summary judgment in favor of the agency.

On appeal, the Second Circuit reversed the district court's decision, holding that Ellen was in the class of persons sought to be protected by the statute:

> Here there seems to be no question that Ellen is within the class of persons sought to be covered; her father, an insured member of the Social Security System, died, she suffered a "loss of parental support," she has diligently pursued her studies, and she has done her level best to comply with the regulations.... At least where a claimant has taken the maximum number of hours available in any accredited school and meets the other conditions of Ellen's case, there should be little question of her right to receive student benefits, under a limited exception to the Department's 20 hour rule, in keeping with the statute and legislative history. Finally, it should not be overlooked that this statute, more than most, was intended to aid beneficiaries rather than ease the lot of administrators.

*Id.* at 667.

We believe *Haberman* is clearly distinguishable from the facts of our case. Unlike Ellen, Steven was able to enroll in the required number of hours to meet the statutory definition of a full-time student. He was fully able to take the minimum number of hours available to retain his dependency status.[8] *Contra Swanson v. Bowen,* No. C–86–20621–WAI, 1988 WL 251979 (N.D.Cal. Feb. 23, 1988).

In our opinion, Steven was in the class of persons entitled to be covered so long as he was a full-time student. But at the point in each semester that his enrollment fell below twelve credit-hours, he became a part-time student and dropped out of the express provisions of the statute. In reaching this conclusion, we are not persuaded by Steven and Lynda's argument that, under a liberal inter-

---

8. We are not persuaded by Steven's argument that the unavailability of two classes during the Spring 1991 semester at Kapiolani Community College is the sole reason he could not enroll as a full-time student. Nothing in the record indicates that Kapiolani Community College was the only available college that Steven could attend.

Moreover, even if Steven would have been able to enroll in the two classes, which would have raised his status from part-time to full-time, his subsequent withdrawal from three credit-hours during the semester would have rendered him a part-time student with a nine credit-hour load.

pretation of the statute, full-time status should be determined only at the beginning of a school semester without regard to subsequent withdrawals. Under Steven and Lynda's interpretation, students could enroll in twelve credit-hours at the start of a semester and then freely withdraw from classes, falling below full-time status, yet still receive benefits as if they were qualified dependents. By awarding benefits to Steven for the entire disputed semesters, and by implication to all part-time students, we would strain the provisions of HRS §§ 386–42 and 386–43 beyond their scope or intent and violate the spirit, if not the letter, of the statutes. *See Hawaiian Airlines, Inc. v. State Dept. of Taxation,* 68 Haw. 391, 400, 716 P.2d 1138, 1144 (1986) ("The most desirable interpretation of a statute is . . . one consistent with both its letter and spirit."); *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892) ("It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.").

Accordingly, to give effect to the plain and obvious meaning of the statute, we hold that part-time students, as defined by each individual educational institution, are not entitled to compensation under HRS §§ 386–42(a) and 386–43(a). Furthermore, we hold that the effective date of a full-time student's eligibility must be determined with precision. We believe, under a liberal construction of the statutes, that a dependent should be entitled to compensation for every portion of a semester that an educational institution considers the dependent to be a full-time student.[9] In our view, this construction of HRS §§ 386–42(a) and 386–43(a) affords dependent children the broadest possible protection and is in harmony with the humanitarian purpose of the workers' com-

pensation statute. *See Respicio,* 67 Haw. at 18, 675 P.2d at 772.

### E. *The LIRAB's Findings Of Fact And Conclusions Of Law.*

Although we agree with the LIRAB that part-time students are not entitled to dependent benefits, and that Steven was not entitled to benefits during his part-time status, we believe the LIRAB did not correctly determine Steven's periods of ineligibility. In addition, the LIRAB's findings of fact on this issue improperly include conclusions of law, which complicate our standard of review. Specifically, findings of fact numbers seven and ten contain what have been referred to as "mixed" findings of fact and conclusions of law:

7. For the fall 1989 semester, Steven Iida registered at the University of Hawai'i at Manoa for four classes for a total of twelve credits. He subsequently withdrew from three classes and reduced his registered credits to three for the fall 1989 semester. He received a failing grade for the class, and earned no credits for that semester. We find that Steven Iida was a part-time student for the fall 1989 semester.

. . . .

10. For the fall 1990 semester, Steven Iida registered for twelve credits at the Hawai'i Pacific University. He subsequently withdrew from two classes and reduced his registered credits to six for the fall 1990 semester. The fall 1990 term for Hawai'i Pacific University began on September 4, 1990, and ended on December 15, 1990. We find that Steven Iida was a part-time student for the fall 1990 semester.[10]

The first three sentences in findings of fact numbers seven and ten are clearly factual determinations by the LIRAB. The last sentences in each finding, however, involve an

---

9. Despite our deference to HAR 12–10–1, we clarify that our holding does not permit an employer to use an educational institution's end-of-semester classification to determine a student's eligibility for benefits under HRS § 386–42(a). A student that is classified as a part-time student at the end of a semester can nevertheless receive benefits for any portion of the semester that the student attended full-time.

10. The Labor and Industrial Relations Appeals Board (LIRAB) made a similar determination concerning the Spring 1991 semester in findings of fact number eleven. After reviewing the record, however, we conclude that Steven was a part-time student for the entire Spring 1991 semester. *See supra* note 8.

implicit statutory interpretation, or in other words, a legal conclusion. By conclusively stating that Steven was a part-time student, the LIRAB must have interpreted the phrase "full-time undergraduate student" found in HRS § 386–42(a) and applied their interpretation to the facts surrounding Steven's enrollments. We believe, however, that the LIRAB's legal conclusions that Steven was a part-time student should have been separately labeled and numbered as conclusions of law. HRS § 91–12 (1993); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 52(a). Consequently, we analyze each portion of findings of fact numbers seven and ten under different standards of review. We review the factual findings in numbers seven and ten under the clearly erroneous standard of review and the legal conclusions under the right/wrong standard. *Atchley,* 80 Hawai'i at 242, 909 P.2d at 570.

Turning now to the merits of numbers seven and ten, we conclude that the LIRAB's factual findings concerning Steven's course loads during the Fall 1989 and Fall 1990 semesters are supported by the record. The record plainly reveals that he initially enrolled in twelve credit-hours in both semesters and then withdrew from nine and six hours, respectively. As a result, the factual findings are not clearly erroneous.

■ Conversely, the legal conclusions in numbers seven and ten are wrong. Students may withdraw from classes either early on or at the eleventh hour of a semester. Indeed, the record in this case indicates that Steven was a full-time student for at least parts of the Fall 1989 and Fall 1990 semesters. Thus, he was not a part-time student, as defined by statute, for the entire semesters.

In light of the foregoing conclusion, we hold that the LIRAB's conclusion of law number three is wrong. As the following excerpt reveals, the LIRAB declared that Steven was a part-time student for the entire semesters in question, without addressing any possible weeks of full-time status:

> 3. Having found that Steven Iida was a part-time student for the fall 1989 semester at the University of Hawai'i and was, therefore, ineligible for dependent benefits, we conclude that Employer is entitled to a

reimbursement for benefits paid during the fall 1989 semester.

As a result of Steven Iida's ineligibility for dependent benefits for the fall 1989 semester, dependent benefits for that semester to Lynda Iida shall be reduced to $214.80 per week (($358 ÷ .6667) × 40%). *See* HRS § 386–41(b). Employer is, therefore, entitled to a reimbursement for benefits paid during the fall 1989 semester in the amount of $2,291.20 (($358.00— $214.80) × 16 weeks).

Having found that Steven Iida was a part-time student for the fall 1990 semester at Hawai'i Pacific University, and that he continued to be on part-time status until the beginning of the fall 1991 semester at Kapiolani Community College, we conclude that Employer is further entitled to a reimbursement for benefits paid from September 4, 1990, the first day of the fall 1990 semester at Hawaii Pacific University, to August 26, 1991, the first day of the fall 1991 semester at Kapiolani Community College when he enrolled and was a full-time student. Employer is, therefore, entitled to a reimbursement in the amount of $10,847.40 ($214.80 × 50.5 weeks).

As we previously held, Steven was entitled to benefits so long as he maintained his status as a full-time student. If Steven was in fact a full-time student for any portion of the semesters in question, he was in the class of persons intended to be covered. It was improper for the LIRAB to retroactively declare Steven a part-time student for portions of the semester that he maintained twelve or more credit-hours per week. It is both unfair and unreasonable to erase a student's bona fide periods of full-time status based on subsequent ineligibility. Moreover, Steven's benefits were calculated on a weekly basis and his student status should therefore be determined based on his status for each week that he received compensation. *See supra* note 9.

Additionally, Lynda was entitled to compensation for any period that Steven maintained his full-time status during the Fall 1989 semester. Consequently, we hold that conclusion of law number three is wrong

because it fails, in its calculation of benefits, to account for all possible periods of full-time status.

### III. DISCUSSION OF THE ATTORNEY'S FEES AND COSTS ORDER

Ala Moana Gifts argues three points of error on the attorney's fees and costs issue: (1) the LIRAB erred by approving Steven and Lynda's untimely request for attorney's fees and costs; (2) the LIRAB erred by finding that Ala Moana Gifts was the losing party on the withdrawn compensability issue; and (3) the LIRAB erred in denying Ala Moana Gifts' request for attorney's fees. Each argument is addressed in order.

A. *Steven And Lynda's Request Was Not Untimely Because The Concession By Ala Moana Gifts Did Not Completely Resolve The Claim For Compensation.*

■ Ala Moana Gifts first argues that Steven and Lynda's request for attorney's fees and costs should have been filed within ten days after the withdrawal of the compensability of Amy's death because the withdrawal was a stipulation and settlement agreement that triggered the ten-day filing deadline. We disagree.

Requests for attorney's fees and costs in workers' compensation cases before the LIRAB are governed by HAR § 12–43–37. As the following excerpt explains, the rule requires attorneys to file their requests within ten days of either a final decision and order or a stipulation and settlement agreement:

Within ten calendar days following the filing of a final decision and order and upon the filing of a stipulation and settlement agreement with respect to an appeal compromised pursuant to [HRS § ] 386–78, ... attorneys seeking approval of fees pursuant to [HRS § ] 386–94, ... shall file with the board a request for approval of attorney's fees setting forth the various

activities performed together with the time expended by the attorney in each activity....

HAR § 12–43–37. An appeal compromised pursuant to HRS § 386–78, according to the provisions of the statute, is one that has been approved by the Director and made a part of the Director's decision: "No compromise in regard to a claim for compensation pending before the director shall be valid unless it is approved by decision of the director as conforming to this chapter and made a part of such decision...." HRS § 386–78(a) (1993).[11] Thus, in our case, we must decide whether Ala. Moana Gifts' September 10, 1992 letter withdrawing the compensability issue was (1) a stipulation and settlement agreement to dispose of the claim for compensation that was (2) approved by the LIRAB and made a part of the LIRAB's decision.

After reviewing the record, we have little trouble concluding that Ala Moana Gifts' letter was not a stipulation and settlement agreement to dispose of Steven and Lynda's entire claim for compensation. On September 8, 1992, Mr. Wong, a member of the law firm representing Ala Moana Gifts, contacted Mr. Takahashi, who was Steven and Lynda's attorney, and informed Mr. Takahashi that Ala Moana Gifts was withdrawing the issue of compensability. The next day, Mr. Takahashi wrote a letter (which is partly recounted in the following passage) to the chairman of the LIRAB notifying him of Mr. Wong's concession:

This letter will confirm that at 2:00 p.m. today Attorney Wayne Wong, counsel for the Employer in the above reference [sic] case informed me that the Employer-appellant is withdrawing the issue of compensability.

The following issues are also withdrawn in light of the withdrawal on compensability:

(1) Entitlement and extent of temporary total disability benefits

---

11. HRS § 386–94, which has no bearing on the timeliness of a request, discusses the agency authority following the filing of a request for attorney's fees and costs:

"Claims for services shall not be valid unless approved by the director or, if an appeal is

had, by the appellate board or court deciding the appeal. Any claim so approved shall be a lien upon the compensation in the manner and to the extent fixed by the director, the appellate board, or the court...."

HRS § 386–94 (1993).

(2) Entitlement and extent of funeral and death benefits

(3) Employer's entitlement and extent of credit, offset, or reimbursement for the payment of worker's compensation benefits which were not due and owing when made. The sole remaining issues are apportionment and dependency.

Since the trial is set for September 22, 1992 and we continue to incur expert costs we are anxious to have a confirmation that the withdrawal will be approved by the Board....

Mr. Wong then sent Mr. Takahashi a letter that reiterated and clarified the withdrawn and remaining issues in the case:

This letter serves to clarify that while the credit issue relative to the payment of temporary total disability and, [sic] funeral and burial benefits has been withdrawn, our clients still assert and claim the issues of apportionment and dependent benefits. Consequently, the withdrawal of the credit issue did not constitute a waiver of any rights or defenses, or admission of liability with respect to the remaining issues before the Labor and Industrial Relations Appeals Board.

Following the preceding exchange of correspondence, the chairman of the LIRAB wrote the following response:

This is to acknowledge receipt of letters from Messrs. Takahashi and Wong both dated September 8, 1992 relating to the withdrawal of *certain issues* on appeal. Mr. Takahashi's letter also requests confirmation by the Board that it will approve the withdrawal of those issues identified in the September 8, 1992 letters.

This is to confirm that such issues are considered withdrawn.

The remaining issues to be adjudicated at the trial scheduled on September 22, 1992 are as follows:

1. Whether Steven Iida should be considered a dependent under [HRS § 386–42]. If so, what is the duration

of his entitlement to dependent weekly benefits?

2. Apportionment, if any, with the State Special Compensation Fund....

(Emphasis added).

Our review of the events surrounding the withdrawal of the compensability issue drives us to the logical conclusion that Ala Moana Gifts conceded only a portion of the appeal before the LIRAB. The exchanges between the parties clearly indicate there were remaining issues to be decided. Stated differently, the concession of the compensability issue did not result in a final resolution of the case. Consequently, there was still a viable claim for compensation pending before the LIRAB after the September 10, 1992 concession by Ala Moana Gifts, namely, Steven's entitlement to compensation and the involvement of the Special Compensation Fund.

■ Based on the foregoing conclusion, and in light of the plain language of HAR § 12–43–37 and HRS § 386–78, we believe Ala Moana Gifts' argument on this issue should be laid to rest. In our assessment, the language in both the rule and the statute refer to compromises or settlements that dispose of an entire case, not merely portions of a case. We therefore conclude that Steven and Lynda were required to file their request within ten days after the LIRAB's January 13, 1994 decision and order, not the September 10, 1992 concession letter.[12]

The record indicates that Steven and Lynda's request was filed on January 24, 1994, which was within ten days of the January 13, 1994 decision and order.[13] Accordingly, we hold that Steven and Lynda made a timely request for attorney's fees and costs under the provisions of HAR § 12–43–37.

B. *The LIRAB Correctly Awarded Attorney's Fees To Steven And Lynda Because Ala Moana Gifts Was The Losing Party On The Conceded Issue.*

■ Ala Moana Gifts' second argument on appeal is that the LIRAB erred in finding

**12.** Requests for attorney's fees and costs may also be filed prior to a final decision and order or a stipulation and settlement agreement.

**13.** Although the literal tenth day after the LIRAB's decision and order was January 23, 1994,

that day fell on a Sunday; thus, Steven and Lynda's filing deadline was extended to Monday, January 24, 1994. *See* Hawai'i Rules of Civil Procedure Rule 6(a).

that Ala Moana Gifts was the losing party on the conceded issue of whether Amy's death was work-related and therefore should not have awarded attorney's fees to Steven and Lynda. We disagree.

The relevant statute on this issue provides that an employer is automatically liable for costs and reasonable attorney's fees if the employer appeals a decision of the Director or LIRAB and loses: "If an employer appeals a decision of the director or appellate board, the costs of the proceedings of the appellate board or supreme court of the State, together with reasonable attorney's fees shall be assessed against the employer, if the employer loses...." HRS § 386-93(b) (1993). The statute and the facts of our case raise the issue of who is considered the prevailing party (or losing party) on an issue that is appealed and subsequently withdrawn.

The issue is one of first impression in our jurisdiction. Although a number of cases have addressed the issue of who is considered the prevailing party on appeal when a case has been decided on the merits by an appellate board's decision and order, no case has broached the issue of withdrawn or conceded issues. As a preliminary matter, we point out that the prevailing party is the party who was successful on the merits of the critical or main issue in a case. *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 620, 575 P.2d 869, 879 (1978); *Mitchell v. BWK Joint Venture*, 57 Haw. 535, 550–51, 560 P.2d 1292, 1301 (1977). We believe the foregoing definition is consistent with both the cases decided by the Hawai'i Supreme Court and the intent of the legislature in enacting HRS § 386-93(b).

In our opinion, the legislature's intent in enacting HRS § 386-93(b), in its simplest form, was to compel employers to shoulder the costs of unsuccessful appeals from work-ers' compensation decisions, while simultaneously easing the financial burden of claimants who must expend time and resources responding to unsuccessful appeals. One goal of the provision is to discourage appeals by employers. Unlike HRS § 386-93(a),[14] which allows costs to be taxed against any party for frivolous appeals, HRS § 386-93(b) places the burden solely on the employer if the employer loses, regardless of the meritorious nature of the appeal. The legislature clearly intended to add an element of risk to any appeal undertaken by an employer. This element of risk, coupled with the different manner in which the legislature addresses appeals by employers and employees, is palpable evidence of the policy to blunt the willingness of employers to appeal decisions of the Director or LIRAB.

Another policy underlying HRS § 386-93(b), which buttresses the beneficent purpose of the workers' compensation statute, is the element of fairness. Employers are typically better able to handle the costs of both defending and appealing a claim for workers' compensation benefits than employees on the other side of the table. We believe the legislature recognized the comparative financial disparities between employers and employees in this context. An employee seeking workers' compensation benefits is, under most circumstances, unemployed.[15] Hence, as a general matter, the costs of proceedings present an onerous burden for employees. It would be inherently inequitable to force an already burdened worker (or his or her dependents) to twice expend funds successfully litigating a claim for workers' compensation. Fairness dictates, then, that employers both assume the risk and ultimately pay for the costs associated with unsuccessful appeals.

The novel question of whether an unsuccessful appeal encompasses issues or entire claims that have been filed and later with-

---

14. This portion of the statute provides: "If the director of labor and industrial relations, appellate board or any court finds that proceedings under this chapter have been brought, prosecuted, or defended without reasonable ground[,] the whole costs of the proceedings may be assessed against the party who has so brought, prosecuted, or defended the proceedings." HRS § 386-93(a) (1993).

15. Of course, unemployment is a non-factor in cases like ours where the employee is deceased. Nevertheless, the principle of financial disparity is generally applicable where dependent children are responsible for the costs of defending an appeal of the deceased worker's claim.

drawn requires us to look at how other jurisdictions have handled similar questions. A number of jurisdictions have concluded that the defendant is the prevailing party and thus entitled to attorney's fees in cases where the plaintiff files and later withdraws a claim.

For example, the Superior Court of Connecticut reached that conclusion in *Fraser v. ETA Ass'n, Inc.*, 41 Conn.Supp. 417, 580 A.2d 94 (1990). In *Fraser*, a dispute over attorney's fees, the plaintiff initially sued the defendants in a breach of lease action. After taking depositions but before trial, the plaintiff withdrew the action. In the meantime, the defendants had retained legal counsel to defend themselves in the action. Following the plaintiff's withdrawal, the defendants filed a claim for attorney's fees under a Connecticut statute that allowed those fees to be recovered in lease actions by "the consumer who successfully prosecutes or defends an action or a counterclaim based upon the contract or lease...." CONN. GEN. STAT. § 42–150bb (1992).

The plaintiff contended that the defendants were not the prevailing parties under the statute because there was no judgment on the merits of the case and that the plaintiff's withdrawal did not conclusively resolve the issues. In response, the defendants argued that they successfully defended the case because, following the withdrawal, they were no longer subject to liability. It indicated, they claimed, that the plaintiff had conceded the fragileness of her case and acknowledged the strength of the defendants' case.

The Superior Court agreed with the defendants. The court first used a standard legal dictionary definition of the phrase "prevailing party," which is in essence the same definition used in Hawai'i. *Compare Fraser*, 580 A.2d at 95 (quoting *Black's Law Dictionary* 1069 (5th ed. 1979)) *with Food Pantry*, 58 Haw. at 620, 575 P.2d at 879. After discussing Florida and Oregon decisions that have reached similar conclusions on related issues, the Superior Court then explained its rationale for accepting the defendants' argument:

> [T]he courts are following a general legislative mandate of rewarding successful litigants while discouraging frivolous suits.... There are decided benefits to interpreting the statute so that defendants in cases withdrawn by plaintiffs can recover their legal expenses. Not only will this discourage frivolous suits, but it will place the burden where it belongs—on the party with the poorly thought out complaint or the hastily conceived writ. It will also discourage vexatious litigation and the use of pretrial discovery and depositions to harass defendants.
>
> It is therefore the conclusion of the court that prevailing party, as used in the lease in question and in § 42–150bb, includes defendants in cases that are withdrawn.

*Fraser*, 580 A.2d at 96. The Superior Court then granted the defendants' motion for attorney's fees. *Id.*

In the Florida case cited by the Superior Court of Connecticut, the District Court of Appeal of Florida held that the defendant was entitled to attorney's fees as the prevailing party in a case where the plaintiff voluntarily dismissed his suit. *Hatch v. Dance*, 464 So.2d 713 (Fla.Dist.Ct.App.1985). *Hatch* was a property transfer dispute. Prior to the dispute, Hatch and Dance signed an agreement containing a loser-pays provision. Dance sued Hatch but later voluntarily dismissed the complaint before trial. The trial court denied Hatch's subsequent motion for attorney's fees.

On appeal, the District Court of Appeal reversed the trial court's decision by simply recognizing and following established precedent on the issue:

> The trial court refused to award attorney's fees on the grounds that the voluntary dismissal precluded the possibility of there being any successful party. However, it is well-established that statutory or contractual provisions providing for an award of attorney's fees to the prevailing party in a litigation encompasses defendants in suits which have been voluntarily dismissed.[16]

---

**16.** The Florida Supreme Court has limited recovery when voluntary dismissal occurs to those cases where attorney's fees are authorized by statute or agreement. *Campbell v. Maze*, 339

*Id.* at 714 (citing *Galbraith v. Inglese*, 402 So.2d 574 (Fla.Dist.Ct.App.1981); *Dolphin Towers Condominium Ass'n v. Del Bene*, 388 So.2d 1268 (Fla.Dist.Ct.App.1980)). The court then reversed and remanded the trial court's denial of Hatch's motion with instructions to award Hatch "attorney's fees as provided by the parties' agreement." *Id.*[17]

We are persuaded by the holdings of our sister states. Holding employers liable for the costs of defending conceded issues or entire claims under the provisions of HRS § 386–93(b) certainly discourages weak appeals. It also reinforces the intent of the legislature by placing the burden of paying for unsuccessful appeals where it belongs—on the party with the poorly thought out, hastily conceived appeal, who can more readily absorb the costs of the appeal. *See Fraser*, 580 A.2d at 96. It will also discourage vexatious litigation and the use of discovery, depositions, motions, and appearances to either harass employees or extract unnecessary expenditures from a party already facing dire financial straits.

Additionally, unlike the previously discussed cases where claims had been withdrawn before trial, cases or issues grounded on HRS § 386–93(b) will have been previously administratively decided on the merits. In other words, the employer will have lost a decision on the merits before the Director or LIRAB and a decision and order will have been entered. This is an important distinction for our purposes because the Hawai'i Supreme Court, as we previously mentioned, considers a prevailing party to be one successful on the merits of the critical or main issue in a case. *Food Pantry*, 58 Haw. at 620, 575 P.2d at 879; *Mitchell*, 57 Haw. at 550–51, 560 P.2d at 1301.

■■■ We believe that when an employer appeals a decision of the Director or LIRAB and subsequently withdraws either the entire appeal or any portion of the appeal, the Director's or LIRAB's decision on the merits

becomes final and the employer is considered the losing party for purposes of HRS § 386–93(b). Put differently, if the employer appeals and later concedes, the employer loses. This interpretation of HRS § 386–93(b) is in line with the oft-stated beneficent purpose of the workers' compensation statute and affords a "liberal construction in favor of the employee." *Respicio*, 67 Haw. at 18, 675 P.2d at 772.

Applying the foregoing law to the facts of our case points squarely to a decision in Steven and Lynda's favor. The Director's December 27, 1990 decision determined that Amy's death was work-related and thus compensable. Ala Moana Gifts initially contested the compensability of Amy's death. Indeed, Ala Moana Gifts maintained its position for nearly two years, from it's January 15, 1991 notice of appeal and March 6, 1991 pretrial statement, until its September 10, 1992 letter to Mr. Takahashi. After Steven and Lynda's counsel had spent seventy of the ninety total hours of legal services preparing to defend the Director's decision, Ala Moana Gifts conceded the compensability of Amy's death. By conceding the compensability of Amy's death, which was the critical issue in the case at the time, the Director's decision on the merits became final. Thus, Ala Moana Gifts lost its appeal on that issue and is responsible for the seventy hours of attorney's fees and costs that Steven and Lynda's counsel expended preparing for the appeal.

Accordingly, we hold that the portion of the LIRAB's May 4, 1994 order awarding attorney's fees and costs to Steven and Lynda for the services rendered before the September 10, 1992 concession of the compensability issue is correct.

### C. *Steven And Lynda Did Not Unreasonably Defend The Remaining Issues.*

■■■ Ala Moana Gift's third argument is that the LIRAB erred when it failed to

---

So.2d 202, 203 (Fla.1976) (citations omitted); *see Reineke v. McKinstry*, 445 So.2d 361, 362 (Fla. Dist.Ct.App.1984) (explaining the *Campbell* decision).

**17.** The Supreme Court of Oregon has reached a similar conclusion in a number of cases. *See, e.g., Dean Vincent, Inc. v. Krishell Labs., Inc.*, 271 Or. 356, 532 P.2d 237 (1975); *Ferrell v. Leach*, 268 Or. 299, 520 P.2d 357 (1974); *Sackett v. Mitchell*, 264 Or. 396, 505 P.2d 1136 (1973).

award attorney's fees under the provisions of HRS § 386–93(a). We disagree.

Ala Moana Gift's argument on this issue is not persuasive. HRS § 386–93(a) only allows an employer to recover the costs of proceedings that have been "brought, prosecuted, or defended without reasonable ground...." Our *de novo* review of the record does not reveal any evidence that Steven and Lynda unreasonably defended Steven's entitlement to benefits. Similarly, Ala Moana Gifts' appellate brief fails to clarify precisely how or why the LIRAB should have determined that Steven and Lynda defended Ala Moana Gifts' appeal without reasonable ground.

We succinctly reject this argument by highlighting that Steven and Lynda prevailed on the central bone of contention ultimately decided by the LIRAB. In its post-trial brief before the LIRAB, Ala Moana Gifts argued that Steven "was not entitled to dependent benefits from May 12, 1989 through November 28, 1991, and, thus, all of the benefits paid him during those periods should be reimbursed." In essence, Ala Moana Gifts believed that Steven was not entitled to any of the weekly compensation benefits following his mother's death. The LIRAB disagreed, however, and determined that Steven was a qualified dependent for at least portions of the periods in question and reduced the overall award of $36,935.38 by $10,847.40. The fact that the LIRAB in large part agreed with Steven and Lynda's argument on appeal nullifies Ala Moana Gifts' contention of unreasonableness.[18]

We therefore hold that the LIRAB correctly determined that Ala Moana Gifts' was not entitled to attorney's fees.

## III. *CONCLUSION*

We hold, on the record before us, that: (1) a child in Steven and Lynda's category must be unmarried, under twenty-two, and a full-time student to receive dependent benefits; (2) a full-time student is an individual who is considered a regular full-time student by the educational institution at which the individual is enrolled or registered; (3) Steven was not entitled to benefits during his periods of part-time enrollment; (4) the factual findings in findings of fact numbers seven and ten are not clearly erroneous; (5) the legal conclusions in findings of fact numbers seven and ten are wrong because they do not correctly determine Steven's periods of ineligibility; (6) conclusion of law number three is inadequate because it fails, in its calculation of benefits, to account for all possible periods of full-time status; (7) the language in HAR § 12–43–37 and HRS § 386–78 regarding the filing of a request for attorney's fees and costs after settlement refer to compromises or settlements that dispose of an entire case, not merely portions of a case; (8) Steven and Lynda's request for attorney's fees and costs was timely; (9) an employer who appeals a decision of the Director or the LIRAB and later concedes is the losing party on appeal under HRS § 386–93(b); (10) Ala Moana Gifts was the losing party on the conceded issue; and (11) the LIRAB properly denied Ala Moana Gifts' request for attorney's fees. Accordingly, we vacate the January 13, 1994 order and remand with instructions to the LIRAB to determine the precise dates of Steven's part-time status and then determine the appropriate amounts of overcompensation owed to Ala Moana Gifts; we affirm, however, the May 4, 1994 order awarding attorney's fees and costs to Steven and Lynda but denying attorney's fees to Ala Moana Gifts.

---

18. We note here that Ala Moana Gifts' request for attorney's fees was filed on February 11, 1994, twenty-nine days after the January 13, 1994 decision and order. And although Steven and Lynda did not appropriately object to the lateness of the filing, the motion was clearly untimely under the provisions of HAR § 12–43–37.