**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001311
28-JAN-2016
07:48 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

HOME & COMMUNITY SERVICES OF HAWAIʻI, INC.,
a Hawaiʻi corporation, PREFERRED HOME & COMMUNITY
BASED SERVICES, INC., a Hawaiʻi corporation, and ALOHA
HABILITATION SERVICES, INC., a Hawaiʻi corporation,
Petitioners/Appellants/Appellants,
v.
DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS,
Respondents/Appellees/Appellees

NO. CAAP-14-0001311

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB-2008-521) (WC 08-01)

JANUARY 28, 2016

FOLEY, PRESIDING J. AND FUJISE, J.,
WITH REIFURTH, J. CONCURRING SEPARATELY

OPINION OF THE COURT BY FOLEY, J.

Petitioners/Appellants/Appellants Home & Community
Services of Hawaii, Inc., Preferred Home & Community Based
Services, Inc., and Aloha Habilitation Services, Inc.
(collectively, **Service Providers**) appeal from the Decision and
Order (**D&O**) issued by the Labor and Industrial Relations Appeals
Board (**LIRAB**) on November 7, 2014.

On appeal, Service Providers contend the LIRAB erred in
affirming the Declaratory Ruling that Service Providers'

subcontractors were not excluded from the definition of "employment" under the statutory exemption found in Hawaii Revised Statutes (**HRS**) § 386-1 (Supp. 2003).[1]

## I.  BACKGROUND

The Department of Human Services (**DHS**), a State agency that receives and manages Medicaid funding to provide home and community-based services to disabled adults under the Social Security Act, 42 C.F.R. Part 441 Subpart G, contracted with Service Providers to provide Medicaid Waiver attendant and in-home day care services to qualified disabled individuals.[2] The DHS's contracts allowed Service Providers to hire subcontractors to provide the direct services to disabled individuals. Under the DHS contracts, Service Providers received payments directly from DHS, and Service Providers were responsible for paying the subcontractors.

Between 2004 and 2006, Service Providers obtained workers' compensation insurance from Intervenor/Appellee/Appellee Hawaii Employers' Mutual Insurance Company, Inc. (**HEMIC**) for their employees, but did not obtain insurance coverage for their subcontractors. On February 17, 2005, then-Director of

---

[1]  HRS § 386-1 provided, in pertinent part:

> **§386-1 Definitions.**  In this chapter, unless the context otherwise requires:
>
> . . . .
>
> "Employment" means any service performed by an individual for another person under any contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully entered into.  It includes service of public officials, whether elected or under any appointment or contract of hire express or implied.
>
> "Employment" does not include the following service:
>
> . . . .
>
> (6)  Domestic, which includes attendant care, and day care services authorized by the department of human services under the Social Security Act, as amended, performed by an individual in the employ of a recipient of social service payments[.]

[2]  The facts included in this background are based primarily on the LIRAB's Findings of Fact (**FOFs**).  The facts recounted in this background are undisputed on appeal unless otherwise indicated.

Respondent/Appellee/Appellee Department of Labor and Industrial Relations (**DLIR**) Nelson B. Befitel issued a declaratory ruling in In re Manawa Lea Health Services, Inc. (**the Manawa Lea Decision**), concluding that an entity similar to Service Providers, which had also used subcontractors to provide Medicaid Waiver services, did not fall within the domestic exemption under the then-existing HRS § 386-1. Following the Manawa Lea Decision, HEMIC sought unpaid workers' compensation insurance premiums from Service Providers for their subcontractors for the period of time between 2004 and 2006.

On May 13, 2008, Service Providers petitioned DLIR for a declaratory ruling establishing:

1.	In the years 2004, 2005 and 2006, [Service Providers'] subcontractors who perform Medicaid Waiver Services ("Subcontractors") were independent contractors and not employees of [Service Providers] in the performance of those services; and

2.	That in the years 2004, 2006 [sic] and 2006, the Subcontractors who performed Medicaid Waiver Services were excluded from "employment" under the then existing "domestic" exemption of [HRS] § 386-1 when they performed those services.

The Director of DLIR, Darwin L.D. Ching (**Director**), issued his Declaratory Ruling on October 22, 2008 (**Director's Declaratory Ruling**) on the issue of "whether individuals who were subcontracted by [Service Providers] to perform Medicaid Waiver services in 2004, 2005, and 2006 were excluded from 'employment' under [HRS] § 386-1(6), commonly called the 'domestic exception.'" The Director concluded:

[T]he domestic exception only covers services provided to a recipient of social service payments where the recipient is: (1) a person who receives social services; and (2) that person also receives social service payments. As [Service Providers] are not recipients of social services, services provided by their workers are not covered by the domestic exception.

Service Providers filed their appeal of the Director's Declaratory Ruling to the LIRAB on November 10, 2008. The LIRAB issued its D&O on November 7, 2014 affirming the Director's Declaratory Ruling. Service Providers appealed to this court on November 21, 2014.

3

## II. STANDARD OF REVIEW

### A. Administrative Rulings

HRS § 91-14(g) (1993) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

See Tauese v. State, Dep't of Labor and Indus. Relations, 113 Hawai'i 1, 25, 147 P.3d 785, 809 (2006). Conclusions of law fall within subsections (1), (2), and (4), and are reviewed de novo under the right/wrong standard. Id. (citing Potter v. Hawai'i Newspaper Agency, 89 Hawai'i 411, 422, 974 P.2d 51, 62 (1999); Tate v. GTE Hawaiian Tel. Co., 77 Hawai'i 100, 103, 881 P.2d 1246, 1249 (1994) (citing State v. Furutani, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1993)). Findings of fact are reviewed under subsection (5) to determine if the agency was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. Tause, 113 Hawai'i at 25, 147 P.3d at 809 (citing Poe v. Hawai'i Labor Relations Bd., 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998)). Questions regarding procedural defects are reviewable to determine whether the decision was made upon unlawful procedure under subsection (3). Tause, 113 Hawai'i at 25, 147 P.3d at 809 (citing Potter, 89 Hawai'i at 422, 974 P.2d at 62).

### B. Statutory Interpretation in Administrative Appeals

The "interpretation of a statute is a question of law reviewable de novo." Survivors of Iida v. Oriental Imports,

Inc., 84 Hawaiʻi 390, 396, 935 P.2d 105, 111 (App. 1997) (internal quotation marks omitted) (quoting Sato v. Tawata, 79 Hawaiʻi 14, 17, 897 P.2d 941, 944 (1995)).

> Our construction of statutes is guided by the following rules:
>
> > First, the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

First Ins. Co. of Hawaii v. A&B Props., 126 Hawaiʻi 406, 414, 271 P.3d 1165, 1173 (2012) (quoting State v. Wheeler, 121 Hawaiʻi 383, 390, 219 P.3d 1170, 1177 (2009)).

"[W]hen, as in this case, an administrative agency is involved, we defer to the agency's interpretations of its rules unless deference would result in an absurd or unjust result, or be plainly erroneous or inconsistent with the underlying legislative purpose." Iida, 86 Hawaiʻi at 396, 935 P.2d at 111 (internal quotation marks omitted) (quoting Int'l Bhd. Of Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 323, 713 P.2d 943, 950 (1986)).

### III. DISCUSSION

Service Providers contend they are covered by the domestic exemption under the then-existing HRS § 386-1, and therefore do not have "employment" relationships with their subcontractors such that Service Providers would be required to comply with HRS chapter 386 (**Workers' Compensation Law**). Service Providers argue that the LIRAB erred by misinterpreting the domestic exemption when it concluded that since Service Providers did not receive Medicaid Waiver social services, they were not covered by the domestic exception in effect prior to 2007.[3]

---

[3] On July 5, 2007, the Governor of Hawaiʻi approved Act 259, which amended HRS § 386-1. 2007 Haw. Sess. Laws Act 259 at 831-41. Section 3 of Act 259 added a new statutory definition of "recipient of social service payments," and provides:

(continued...)

Service Providers argue that the LIRAB rested its erroneous conclusion on its misinterpretation of the statute as ambiguous, and that the plain language of the statute is clear and sufficient to resolve the issue of whether the subcontractors for Service Providers fell within the meaning of the domestic exemption to HRS § 386-1. Service Providers argue that they were recipients of social service payments under the terms of their contracts with DHS, clearly within the meaning of the domestic exemption.

The Director, in his Declaratory Ruling, found that

---

[3](...continued)
SECTION 3. Section 386-1, [HRS], is amended by adding a new definition to be appropriately inserted and to read as follows:

> ""Recipient of social service payments" includes:
> (1)  A person who is an eligible recipient of social services such as attendant care and day care services; and
> (2)  A corporation or private agency that contracts directly with the [DHS] to provide attendant care and day care authorized under the Social Security Act, as amended."

2007 Haw. Sess. Laws Act 259, § 3 at 831-32. Section 7 of Act 259 also amended the domestic exemption:

> SECTION 7. Section 386-1, [HRS], is amended by amending the definition of "employment" to read as follows:
>
> . . . .
>
> (6)  Domestic, [which includes attendant care, and day care services authorized by the department of human services under the Social Security Act, as amended,] in-home and community-based services for persons with developmental disabilities and mental retardation under the medicaid home and community-based services program pursuant to title 42 Code of Federal Regulations sections 440.180 and 441.300, and title 42 Code of Federal Regulations, part 434, subpart A, as amended, and identified as chore, personal assistance and habilitation, residential habilitation, supported employment, respite, and skilled nursing services, as the terms are defined by the department of human services, performed by an individual [in the employ of] whose services are contracted by a recipient of social service payments[,] and who voluntarily agrees in writing to be an independent contractor of the recipient of social service payments[.]

2007 Haw. Sess. Laws Act 259, § 7 at 836.

"whether 'recipients of social service payments' includes anyone receiving social service payments or just recipients of social services who also receive such payments is not plain and obvious." The Director concluded that the domestic exemption "covers services provided to a recipient of social service payments where the recipient is: (1) a person who receives social services; and (2) that person also receives social service payments." The LIRAB upheld the Director's determination. In its FOFs, the LIRAB stated:

> 28. Service Providers and the Director disagreed on what "recipient of social service payments" meant during the period 2004 to 2006. Service Providers contended that "recipient of social service payments" referred to entities like them that received social service payments from DHS. The Director interpreted the term "recipient of social service payments" to be limited or restricted to individuals who were recipients of social services and who also received social service payments.
>
> 29. The divergent interpretations show that there was doubt or ambiguity in the meaning of "recipient of social service payments" in HRS § 386-1(6) prior to 2007.

We hold that the Director's conclusion was plainly erroneous, and the LIRAB erred in adopting the Director's conclusion. See Iida, 86 Hawai'i at 396, 935 P.2d at 111 ("[W]e defer to the agency's interpretations of its rules unless deference would result in an absurd or unjust result, or be 'plainly erroneous or inconsistent with the underlying legislative purpose.'").

The Director's conclusion that a person must receive social services in order to qualify for the domestic exemption under HRS § 386-1 is simply not supported by any conceivable reading of the statute. There is no "doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression" in the domestic exemption. See First Ins. Co. of Hawaii, 126 Hawai'i at 414, 271 P.3d at 1173 (quoting Wheeler, 121 Hawai'i at 390, 219 P.3d at 1177). Statutory language is not ambiguous merely because parties present differing constructions or interpretations to the court. See In re Krafft-Murphy Co., Inc., 82 A.3d 696, 702 (Del. 2013) (adopting the lower court's observation that "[t]he fact that the parties disagree about the meaning of the statute does not create ambiguity"); Farm Bureau

Mut. Ins. Co. of Idaho v. Eisenman, 286 P.3d 185, 188 (Idaho 2012) ("[S]tatutory language is not ambiguous 'merely because the parties present differing interpretations to the court.'") (citation omitted); In re Commitment of West, 800 N.W.2d 929, 942 (Wis. 2011) ("The fact that the parties advance different interpretations of a statute does not, alone, make the statute ambiguous."). Therefore, this court will not defer to the LIRAB's interpretation of the domestic exemption.

DLIR argues that the legislative history of the statute indicates a legislative intent that conflicts with a plain reading of the statute, thus creating an ambiguity in the statutory language. DLIR looks to the purpose clause of Act 110, 1978 Haw. Sess. Laws Act 110, § 1 at 190, and a standing committee report, S. Stand. Comm. Rep. No. 314-78, in 1978 Senate Journal, at 898, to suggest that the "domestic exemption was created for recipients of social services[.]" (Emphasis omitted.) While DLIR's conclusion about the purpose of the domestic exemption may be true, nothing in the legislative history suggests that the final language of the statute was meant to encompass only those individual recipients of social services who hire other individuals for personal domestic care within the meaning of the domestic exemption. Stated another way, the legislative history does not suggest that the statute is supposed to be read, or even that the statute could reasonably be read, to apply only to recipients of social services who also receive such payments.

Because we hold that the language of the statute is plain and unambiguous, "our sole duty is to give effect to its plain and obvious meaning." See First Ins. Co. of Hawaii, 126 Hawai'i at 414, 271 P.3d at 1173 (quoting Wheeler, 121 Hawai'i at 390, 219 P.3d at 1177). HRS § 386-1, for the period of time in question, exempts from coverage under the Workers' Compensation Law those who provide domestic services performed by an individual who is employed by an entity that receives social service payments.

DHS contracted with Service Providers to provide Medicaid Waiver services to elderly and disabled adults. Under

the contracts, DHS made social service payments to Service Providers in exchange for their Medicaid Waiver services. Service Providers were permitted to hire subcontractors to provide the Medicaid Waiver services to eligible individuals. Service Providers' relationship to their subcontractors were thus exempted from the meaning of "employment" under HRS § 386-1 because the subcontractors hired by Service Providers were providing domestic and day care services, and Service Providers were receiving payments for the social services provided to the eligible individuals.

## IV. CONCLUSION

Therefore, the Decision and Order issued by the Labor and Industrial Relations Appeals Board on November 7, 2014 is vacated and this case is remanded for proceedings consistent with this Opinion.

On the briefs:

Kenneth M. Nakasone
Thao T. Tran
Nicholas R. Monlux
(Kobayashi Sugita & Goda)
for Petitioners/Appellants/Appellants.

Frances E.H. Lum
J. Gerard Lam
Deputy Attorneys General
for Respondent/Appellee/Appellee.

<u>CONCURRING OPINION OF REIFURTH, J.</u>

I concur in the holding and analysis in this case with a single exception that does not affect the judgment. I write separately to emphasize my belief that "[b]ecause we hold that the language of the statute is plain and unambiguous," it is unnecessary for us to consider the legislative history surrounding the domestic exemption. *See* Slip. Op. at 8; Haw. Rev. Stat. § 1-15(2) (2009) (*"Where the words of a law are ambiguous*: . . . . The reason and spirit of the law, and the cause which induced the legislature to enact it, *may* be considered to discover its true meaning." (emphasis added.)) Furthermore, because it is our role to determine the meaning of the statutory text, we do not determine, divine, or even consider "legislative intent" when the text's meaning is otherwise clear. *See* Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899) ("We do not inquire what the legislature meant; we ask only what the statute means.").

*Lawrence M. Reifurth*
Associate Judge